**THE BONA FIDE OCCUPATIONAL QUALIFICATION DEFENSE**

**DIAZ v. PAN AMERICAN WORLD AIRWAYS, INC.,**

**442 F.2d 385 (5th Cir. 1971)**

TUTTLE, Circuit Judge:

This appeal presents the important question of whether Pan American Airlines' refusal to hire appellant and his class of males solely on the basis of their sex violates § 703(a)(1) of Title VII of the 1964 Civil Rights Act. Because we feel that being a female is not a 'bona fide occupational qualification' for the job of flight cabin attendant, appellee's refusal to hire appellant's class solely because of their sex, does constitute a violation of the Act.

The facts in this case are not in dispute. Celio Diaz applied for a job as flight cabin attendant with Pan American Airlines in 1967. He was rejected because Pan Am had a policy of restricting its hiring for that position to females. He then filed charges with the Equal Employment Opportunity Commission (EEOC) alleging that Pan Am had unlawfully discriminated against him on the grounds of sex. The Commission found probable cause to believe his charge, but was unable to resolve the matter through conciliation with Pan Am. Diaz next filed a class action in the United States District Court for the Southern District of Florida on behalf of himself and others similarly situated, alleging that Pan Am had violated Section 703 of the 1964 Civil Rights Act by refusing to employ him on the basis of his sex; he sought an injunction and damages.

Pan Am admitted that it had a policy of restricting its hiring for the cabin attendant position to females. Thus, both parties stipulated that the primary issue for the District Court was whether, for the job of flight cabin attendant, being a female is a 'bona fide occupational qualification (hereafter BFOQ) reasonably necessary to the normal operation' of Pan American's business.

The trial court found that being a female was a BFOQ.

We note, at the outset, that there is little legislative history to guide our interpretation. The amendment adding the word 'sex' to 'race, color, religion and national origin' was adopted one day before House passage of the Civil Rights Act. It was added on the floor and engendered little relevant debate. In attempting to read Congress' intent in these circumstances, however, it is reasonable to assume, from a reading of the statute itself, that one of Congress' main goals was to provide equal access to the job market for both men and women. Indeed, as this court in *Weeks v. Southern Bell Telephone and Telegraph Co.*, 408 F.2d 228 at 235 (5th Cir. 1967) clearly stated, the purpose of the Act was to provide a foundation in the law for the principle of nondiscrimination. Construing the statute as embodying such a principle is based on the assumption that Congress sought a formula that would not only achieve the optimum use of our labor resources but, and more importantly, would enable individuals to develop as individuals.

1

Attainment of this goal, however, is, as stated above, limited by the bona fide occupational qualification exception in section 703(e). In construing this provision, we feel, as did the court in Weeks, supra, that it would be totally anomalous to do so in a manner that would, in effect, permit the exception to swallow the rule. Thus, we adopt the EEOC guidelines which state that 'the Commission believes that the bona fide occupational qualification as to sex should be interpreted narrowly.' Indeed, close scrutiny of the language of this exception compels this result. As one commentator has noted:

'The sentence contains several restrictive adjectives and phrases: it applies only 'in those certain instances' where there are 'bona fide' qualifications 'reasonably necessary' to the In operation of that 'particular' enterprise. The care with which Congress has chosen the words to emphasize the function and to limit the scope of the exception indicates that it had no intention of opening the kind of enormous gap in the law which would exist if (for example) an employer could legitimately discriminate against a group solely because his employees, customers, or clients discriminated against that group. Absent much more explicit language, such a broad exception should not be assumed for it would largely emasculate the act.' 65 Mich.L.Rev. (1966).

Thus, it is with this orientation that we now examine the trial court's decision. Its conclusion was based upon (1) its view of Pan Am's history of the use of flight attendants; (2) passenger preference; (3) basic psychological reasons for the preference; and (4) the actualities of the hiring process.

Having reviewed the evidence submitted by Pan American regarding its own experience with both female and male cabin attendants it had hired over the years, the trial court found that Pan Am's current hiring policy was the result of a pragmatic process, 'representing a judgment made upon adequate evidence acquired through Pan Am's considerable experience, and designed to yield under Pan Am's current operating conditions better average performance for its passengers than would a policy of mixed male and female hiring.' The performance of female attendants was better in the sense that they were superior in such non-mechanical aspects of the job as 'providing reassurance to anxious passengers, giving courteous personalized service and, in general, making flights as pleasurable as possible within the limitations imposed by aircraft operations.'

The trial court also found that Pan Am's passengers overwhelmingly preferred to be served by female stewardesses. Moreover, on the basis of the expert testimony of a psychiatrist, the court found that an airplane cabin represents a unique environment in which an air carrier is required to take account of the special psychological needs of its passengers. These psychological needs are better attended to by females. This is not to say that there are no males who would not have the necessary qualities to perform these non-mechanical functions, but the trial court found that the actualities of the hiring process would make it more difficult to find these few males. Indeed, 'the admission of men to the hiring process, in the present state of the art of employment selection, would have increased the number of unsatisfactory employees hired, and reduced the average levels of performance of Pan Am's complement of flight attendants. Am's complement of flight attendants.

of the difficulties which the trial court found would follow from admitting males to this job the court said 'that to eliminate the female sex qualification would simply eliminate the best available tool for screening out applicants likely to be unsatisfactory and thus reduce the average level of performance.'

Because of the narrow reading we give to section 703(e), we do not feel that these findings justify the discrimination practiced by Pan Am.

We begin with the proposition that the use of the word 'necessary' in section 703(e) requires that we apply a business necessity test, not a business convenience test. That is to say, discrimination based on sex is valid only when the essence of the business operation would be undermined by not hiring members of one sex exclusively.

The primary function of an airline is to transport passengers safely from one point to another. While a pleasant environment, enhanced by the obvious cosmetic effect that female stewardesses provide as well as, according to the finding of the trial court, their apparent ability to perform the non- mechanical functions of the job in a more effective manner than most men, may all be important, they are tangential to the essence of the business involved. No one has suggested that having male stewards will so seriously affect the operation of an airline as to jeopardize or even minimize its ability to provide safe transportation from one place to another. Indeed the record discloses that many airlines including Pan Am have utilized both men and women flight cabin attendants in the past and Pan Am, even at the time of this suit, has 283 male stewards employed on some of its foreign flights.

We do not mean to imply, of course, that Pan Am cannot take into consideration the ability of individuals to perform the non-mechanical functions of the job. What we hold is that because the non-mechanical aspects of the job of flight cabin attendant are not 'reasonably necessary to the normal operation' of Pan Am's business, Pan Am cannot exclude all males simply because most males may not perform adequately.

Appellees argue, however, that in so doing they have complied with the rule in Weeks. In that case, the court stated:

We conclude that the principle of non-discrimination requires that we hold that in order to rely on the bona fide occupational qualification exception an employer has the burden of proving that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved. Id. 408 F.2d at 235

We do not agree that in this case 'all or substantially all men' have been shown to be inadequate and, in any event, in Weeks, the job that most women supposedly could not do was necessary to the normal operation of the business. Indeed, the inability of switchman to perform his or her job could cause the telephone system to break down. This is of an entirely different magnitude than a male steward who is perhaps not as soothing on a flight as a female stewardess.

3

Appellees also argue, and the trial court found, that because of the actualities of the hiring process, 'the best available initial test for determining whether a particular applicant for employment is likely to have the personality characteristics conducive to high-level performance of the flight attendant's job as currently defined is consequently the applicant's biological sex.' Indeed, the trial court found that it was simply not practicable to find the few males that would perform properly.

We do not feel that this alone justifies discriminating against all males. Since, as stated above, the basis of exclusion is the ability to perform non- mechanical functions which we find to be tangential to what is 'reasonably necessary' for the business involved, the exclusion of all males because this is the best way to select the kind of personnel Pan Am desires simply cannot be justified. Before sex discrimination can be practiced, it must not only be shown that it is impracticable to find the men that possess the abilities that women possess, but that the abilities are necessary to the business, not merely tangential.

Similarly, we do not feel that the fact that Pan Am's passengers prefer female stewardesses should alter our judgment. On this subject, EEOC guidelines state that a BFOQ ought not be based on 'the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers. * * *' 29 CFR § 1604.1(iii).

As the Supreme Court stated in *Griggs v. Duke Power Co.*, 400 U.S.424 (1971), 'the administration interpretation of the Act by the enforcing agency is entitled to great deference. While we recognize that the public's expectation of finding one sex in a particular role may cause some initial difficulty, it would be totally anomalous if we were to allow the preferences and prejudices of the customers to determine whether the sex discrimination was valid. Indeed, it was, to a large extent, these very prejudices the Act was meant to overcome. Thus, we feel that customer preference may be taken into account only when it is based on the company's inability to perform the primary function or service it offers.

Of course, Pan Am argues that the customers' preferences are not based on 'stereotyped thinking,' but the ability of women stewardesses to better provide the non-mechanical aspects of the job. Again, as stated above, since these aspects are tangential to the business, the fact the customers prefer them cannot justify sex discrimination.

The judgment is reversed and the case is remanded for proceedings not inconsistent with this opinion.

## DOTHARD v. RAWLINSON

### 433 U.S. 321 (1977)

Mr. Justice STEWART delivered the opinion of the Court.

Appellee Dianne Rawlinson sought employment with the Alabama Board of Corrections as

4

a prison guardCalled in Alabama a 'correctional counselor.' After her application was rejected, she brought this class suit under Title VII of the Civil Rights Act of 1964.

While the suit was pending, the Alabama Board of Corrections adopted Administrative Regulation 204, establishing gender criteria for assigning correctional counselors to maximum-security institutions for 'contact positions,' that is, positions requiring continual close physical proximity to inmates of the institution. Rawlinson amended her class-action complaint by adding a challenge to regulation 204 as also violative of Title VII.

Like most correctional facilities in the United States, Alabama's prisons are segregated on the basis of sex. [I]nmate living quarters are for the most part large dormitories, with communal showers and toilets that are open to the dormitories and hallways. [Two] penitentiaries carry on extensive farming operations, making necessary a large number of strip searches for contraband when prisoners re- enter the prison buildings.

A correctional counselor's primary duty within these institutions is to maintain security and control of the inmates by continually supervising and observing their activities. At the time this litigation was in the District Court, the Board of Corrections employed a total of 435 people in various correctional counselor positions, 56 of whom were women. Of those 56 women, 21 were employed at the Julia Tutwiler Prison for Women, 13 were employed in noncontact positions at the four male maximum-security institutions, and the remaining 22 were employed at the other institutions operated by the Alabama Board of Corrections. Because most of Alabama's prisoners are held at the four maximum-security male penitentiaries, 336 of the 435 correctional counselor jobs were in those institutions, a majority of them concededly in the 'contact' classification. Thus, women applicants could under Regulation 204 compete equally with men for only about 25% of the correctional counselor jobs available in the Alabama prison system.

III

Unlike the statutory height and weight requirements, Regulation 204 explicitly discriminates against women on the basis of their sex[16]. defense of this overt discrimination, the appellants rely on § 703(e) of Title VII, which permits sex-based discrimination 'in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation

---

[16]By its terms Regulation 204 applies to contact positions in both male and female institutions. See n. 6, supra. The District Court found, however, that 'Regulation 204 is the administrative means by which the (Board of Corrections') policy of not hiring women as correctional counselors in contact positions in all-male penitentiaries has been implemented.' The Regulation excludes women from consideration for approximately 75% of the available correctional counselor jobs in the Alabama prison system.

Case 6:10-cv-03305-RED    Document 136-1    Filed 08/26/11    Page 5 of 32

of that particular business or enterprise.'

The District Court rejected the bona-fideoccupational-qualification (bfoq) defense, relying on the virtually uniform view of the federal courts that § 703(e) provides only the narrowest of exceptions to the general rule requiring equality of employment opportunities. This view has been variously formulated. In *Diaz v. Pan American World Airways*, 442 F.2d 385, 388, the Court of Appeals for the Fifth Circuit held that 'discrimination based on sex is valid only when the essence of the business operation would be undermined by not hiring members of one sex exclusively.' (Emphasis in original.) In an earlier case, *Weeks v. Southern Bell Telephone and Telegraph Co.*, 5 Cir., 408 F.2d 228, 235, the same court said that an employer could rely on the bfoq exception only by proving 'that he had reasonable cause to believe, that is, a factual basis for believing, that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved.' But whatever the verbal formulation, the federal courts have agreed that it is impermissible under Title VII to refuse to hire an individual woman or man on the basis of stereotyped characterizations of the sexes, and the District Court in the present case held in effect that Regulation 204 is based on just such stereotypical assumptions.

We are persuaded by the restrictive language of § 703(e), the relevant legislative history, and the consistent interpretation of the Equal Employment Opportunity Commission that the bfoq exception was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex.[18]  In the particular factual circumstances of this case, however, we conclude that the District Court erred in rejecting the State's contention that Regulation 204 falls within the narrow ambit of the bfoq exception.

The environment in Alabama's penitentiaries is a peculiarly inhospitable one for human beings of whatever sex. Indeed, a Federal District Court has held that the conditions of confinement in the prisons of the State, characterized by 'rampant violence' and a 'jungle atmosphere,' are constitutionally intolerable. *Pugh v. Locke*, 406 F.Supp. 318, 325 (MD Ala. 1976). The record in the present case shows that because of inadequate staff and facilities, no attempt is made in the four maximum-security male penitentiaries to classify or segregate inmates according to their offense or level of dangerousness a procedure that, according to expert testimony, is essential to effective penological administration. Consequently, the estimated 20% of the male prisoners who are sex offenders are scattered throughout the penitentiaries' dormitory facilities.

In this environment of violence and disorganization, it would be an oversimplification to

_____

[18]In the case of a state employer, the bfoq exception would have to be interpreted at the very least so as to conform to the Equal Protection Clause of the Fourteenth Amendment. The parties do not suggest, however, that the Equal Protection Clause requires more rigorous scrutiny of a State's sexually discriminatory employment policy than does Title VII. There is thus no occasion to give independent consideration to the District Court's ruling that Regulation 204 violates the Fourteenth Amendment as well as Title VII.

6

characterize Regulation 204 as an exercise in 'romantic paternalism.' Cf. *Frontiero v. Richardson*, 411 U.S. 677, 684. In the usual case, the argument that a particular job is too dangerous for women may appropriately be met by the rejoinder that it is the purpose of Title VII to allow the individual woman to make that choice for herself. More is at stake in this case, however, than an individual woman's decision to weigh and accept the risks of employment in a 'contact' position in a maximum-security male prison.

The essence of a correctional counselor's job is to maintain prison security. A woman's relative ability to maintain order in a male, maximum- security, unclassified penitentiary of the type Alabama now runs could be directly reduced by her womanhood. There is a basis in fact for expecting that sex offenders who have criminally assaulted women in the past would be moved to do so again if access to women were established within the prison. There would also be a real risk that other inmates, deprived of a normal heterosexual environment, would assault women guards because they were women.[22] In a prison system where violence is the order of the day, where inmate access to guards is facilitated by dormitory living arrangements, where every institution is understaffed, and where a substantial portion of the inmate population is composed of sex offenders mixed at random with other prisoners, there are few visible deterrents to inmate assaults on women custodians.

Appellee Rauwlinson's own expert testified that dormitory housing for aggressive inmates poses a greater security problem than single-cell lockups, and further testified that it would be unwise to use women as guards in a prison where even 10% of the inmates had been convicted of sex crimes and were not segregated from the other prisoners.[23] The likelihood that inmates would assault a woman because she was a woman would pose a real threat not only to the victim of the assault but also to the basic control of the penitentiary and protection of its inmates and the other security personnel. The employee's very womanhood would thus directly undermine her capacity to provide the security that is the essence of a correctional counselor's responsibility.

There was substantial testimony from experts on both sides of this litigation that the use of women as guards in 'contact' positions under the existing conditions in Alabama maximum-security male penitentiaries would pose a substantial security problem, directly linked to the sex of the prison guard. On the basis of that evidence, we conclude that the District Court was in error in ruling that being male is not a bona fide occupational qualification for the job of correctional counselor in a

---

[22]The record contains evidence of an attack on a female clerical worker in an Alabama prison, and of an incident involving a woman student who was taken hostage during a visit to one of the maximum-security institutions.

[23]Alabama's penitentiaries are evidently not typical. Appellee Rawlinson's two experts testified that in a normal, relatively stable maximum-security prison characterized by control over the inmates, reasonable living conditions, and segregation of dangerous offenders women guards could be used effectively and beneficially. Similarly, an amicus brief filed by the State of California attests to that State's success in using women guards in all-male penitentiaries.

7

'contact' position in an Alabama male maximum-security penitentiary.[24]

The judgment is accordingly affirmed in part and reversed in part, and the case is remanded to the District Court for further proceedings consistent with this opinion.

Mr. Justice MARSHALL, with whom Mr. Justice BRENNAN joins, concurring in part and dissenting in part.

I must, however, respectfully disagree with the Court's application of the bfoq exception in this case.

The Court properly rejects two proffered justifications for denying women jobs as prison guards. It is simply irrelevant here that a guard's occupation is dangerous and that some women might be unable to protect themselves adequately. Those themes permeate the testimony of the state officials below, but as the Court holds, 'the argument that a particular job is too dangerous for women' is refuted by the 'purpose of Title VII to allow the individual woman to make that choice for herself.'

What would otherwise be considered unlawful discrimination against women is justified by the Court, however, on the basis of the 'barbaric and inhumane' conditions in Alabama prisons, conditions so bad that state officials have conceded that they violate the Constitution. See *Pugh v. Locke*, 406 F.Supp. 318, 329, 331 (MD Ala.1976). To me, this analysis sounds distressingly like saying two wrongs make a right. It is refuted by the plain words of § 703(e). The statute requires that a bfoq be 'reasonably necessary to the normal operation of that particular business or enterprise.' But no governmental 'business' may operate 'normally' in violation of the Constitution. Every action of government is constrained by constitutional limitations. While those limits may be violated more frequently than we would wish, no one disputes that the 'normal operation' of all government functions takes place within them. A prison system operating in blatant violation of the Eighth Amendment is an exception that should be remedied with all possible speed, as Judge Johnson's comprehensive order in *Pugh v. Locke*, supra, is designed to do. In the meantime, the existence of such violations should not be legitimatized by calling them 'normal.' Nor should the Court accept them as justifying conduct that would otherwise violate a statute intended to remedy age-old discrimination.

The Court's error in statutory construction is less objectionable, however, than the attitude it displays toward women. Though the Court recognizes that possible harm to women guards is an unacceptable reason for disqualifying women, it relies instead on an equally speculative threat to prison discipline supposedly generated by the sexuality of female guards. There is simply no evidence in the record to show that women guards would create any danger to security in Alabama

---

[24]The record shows, by contrast, that Alabama's minimum-security facilities, such as work-release centers, are recognized by their inmates as privileged confinement situations not to be lightly jeopardized by disobeying applicable rules of conduct. Inmates assigned to these institutions are thought to be the 'cream of the crop' of the Alabama prison population.

8

prisons significantly greater than that which already exists. All of the dangers with one exception discussed below are inherent in a prison setting, whatever the gender of the guards.

The Court first sees women guards as a threat to security because 'there are few visible deterrents to inmate assaults on women custodians.' In fact, any prison guard is constantly subject to the threat of attack by inmates, and 'invisible' deterrents are the guard's only real protection. No prison guard relies primarily on his or her ability to ward off an inmate attack to maintain order. Guards are typically unarmed and sheer numbers of inmates could overcome the normal complement. Rather, like all other law enforcement officers, prison guards must rely primarily on the moral authority of their office and the threat of future punishment for miscreants. As one expert testified below, common sense, fairness, and mental and emotional stability are the qualities a guard needs to cope with the dangers of the job. Well qualified and properly trained women, no less than men, have these psychological weapons at their disposal.

The particular severity of discipline problems in the Alabama maximum-security prisons is also no justification for the discrimination sanctioned by the Court. The District Court found in Pugh v. Locke, supra, that guards 'must spend all their time attempting to maintain control or to protect themselves.' If male guards face an impossible situation, it is difficult to see how women could make the problem worse, unless one relies on precisely the type of generalized bias against women that the Court agrees Title VII was intended to outlaw. For example, much of the testimony of appellants' witnesses ignores individual differences among members of each sex and reads like 'ancient canards about the proper role of women.' *Phillips v. Martin Marietta Corp.*, 400 U.S., at 545, The witnesses claimed that women guards are not strict disciplinarians; that they are physically less capable of protecting themselves and subduing unruly inmates; that inmates take advantage of them as they did their monthers, while male guards are strong father figures who easily maintain discipline, and so on.[2] Yet the record shows that the presence of women guards has not led to a single incident

_____

[2]The State Commissioner of Corrections summed up these prejudices in his testimony:
'Q Would a male that is 5'6", 140 lbs., be able to perform the job of Correctional Counselor in an all male institution?
'A Well, if he qualifies otherwise, yes.
'Q But a female 5'6", 140 lbs., would not be able to perform all the duties?
'A No.
'Q What do you use as a basis for that opinion?
'A The innate intention between a male and a female. The physical capabilities, the emotions that go into the psychic make-up of a female vs. the psychic make-up of a male. The attitude of the rural type inmate we have vs. that of a woman. The superior feeling that a man has, historically, over that of a female.' Strikingly similar sentiments were expressed a century ago by a Justice of this Court in a case long since discredited:
'I am not prepared to say that it is one of (women's) fundamental rights and privileges to be admitted into every office and position, including those which require highly special qualifications and demanding special responsibilities. . . . (I)n my opinion, in view of the particular characteristics, destiny, and mission of woman, it is within the province of the

amounting to a serious breach of security in any Alabama institution.[3] And, in any event, '(g)uards rarely enter the cell blocks and dormitories,' *Pugh v. Locke*, 406 F.Supp., at 325, where the danger of inmate attacks is the greatest.

It appears that the real disqualifying factor in the Court's view is '(t)he employee's very womanhood.' The Court refers to the large number of sex offenders in Alabama prisons, and to '(t)he likelihood that inmates would assault a woman because she was a woman.' Ibid. In short, the fundamental justification for the decision is that women as guards will generate sexual assaults. With all respect, this rationale regrettably perpetuates one of the most insidious of the old myths about women that women, wittingly or not, are seductive sexual objects. The effect of the decision, made I am sure with the best of intentions, is to punish women because their very presence might provoke sexual assaults. It is women who are made to pay the price in lost job opportunities for the threat of depraved conduct by prison inmates. Once again, '(t)he pedestal upon which women have been placed has . . ., upon closer inspection, been revealed as a cage.' *Sail'er Inn, Inc. v. Kirby*, 5 Cal.3d 1, 20, 95 Cal.Rptr. 329, 341, 485 P.2d 529, 541 (1971). It is particularly ironic that the cage is erected here in response to feared misbehavior by imprisoned criminals.

The Court points to no evidence in the record to support the asserted 'likelihood that inmates would assault a woman because she was a woman.' Perhaps the Court relies upon common sense, or 'innate recognition.' Brief for Appellants 51. But the danger in this emotionally laden context is that common sense will be used to mask the "romantic paternalism" and persisting discriminatory attitudes that the Court properly eschews. To me, the only matter of innate recognition is that the incidence of sexually motivated attacks on guards will be minute compared to the 'likelihood that inmates will assault' a guard because he or she is a guard.

The proper response to inevitable attacks on both female and male guards is not to limit the employment opportunities of law-abiding women who wish to contribute to their community, but to take swift and sure punitive action against the inmate offenders. Presumably, one of the goals of the Alabama prison system is the eradication of inmates' antisocial behavior patterns so that prisoners will be able to live one day in free society. Sex offenders can begin this process by learning to relate to women guards in a socially acceptable manner. To deprive women of job opportunities because

---

legislature to ordain what offices, positions, and callings shall be filled and discharged by men, and shall receive the benefit of those energies and responsibilities, and that decision and firmness which are presumed to predominate in the sterner sex.' Bradwell v. Illinois, 16 Wall. 130, 139 (1873) (Bradley, J., concurring).


[3] The Court refers to two incidents involving potentially dangerous attacks on women in prisons. But these did not involve trained corrections officers; one victim was a clerical worker and the other a student visiting on a tour.

of the threatened behavior of convicted criminals is to turn our social priorities upside down.[5]

Although I do not countenance the sex discrimination condoned by the majority, it is fortunate that the Court's decision is carefully limited to the facts before it. I trust the lower courts will recognize that the decision was impelled by the shockingly inhuman conditions in Alabama prisons, and thus that the 'extremely narrow (bfoq) exception' recognized here, will not be allowed 'to swallow the rule' against sex discrimination. See *Phillips v. Martin Marietta Corp.*, 400 U.S., at 545. Expansion of today's decision beyond its narrow factual basis would erect a serious roadblock to economic equality for women.

## HARDIN v. STYNCHCOMB

### 691 F.2d 1364 (11th Cir. 1982)

VANCE, Circuit Judge:

Mary Delia Russaw Hardin, a resident of Fulton County, Georgia, applied for a position as Deputy Sheriff I with the Sheriff's Department of Fulton County. When her application was rejected she filed a class action alleging that Leroy N. Stynchcombe, Sr., the Sheriff of Fulton County, the Sheriff's Department and the directors and members of the Fulton County Personnel Board (Personnel Board) engaged in discriminatory employment practices in violation of Title., of 42 U.S.C. § 1983 and of the fourteenth amendment of the United States Constitution. Hardin alleges that defendants have discriminated against her and other similarly situated women by failing to consider them for employment as deputy sheriffs and by establishing and maintaining sexually segregated job classifications that unjustifiably exclude qualified females from jobs and job

---

[5]The appellants argue that restrictions on employment of women are also justified by consideration of inmates' privacy. It is strange indeed to hear state officials who have for years been violating the most basic principles of human decency in the operation of their prisons suddenly become concerned about inmate privacy. It is stranger still that these same officials allow women guards in contact positions in a number of nonmaximum-security institutions, but strive to protect inmates' privacy in the prisons where personal freedom is most severely restricted. I have no doubt on this record that appellants' professed concern is nothing but a feeble excuse for discrimination.

As the District Court suggested, it may well be possible, once a constitutionally adequate staff is available, to rearrange work assignments so that legitimate inmate privacy concerns are respected without denying jobs to women. Finally, if women guards behave in a professional manner at all times, they will engender reciprocal respect from inmates, who will recognize that their privacy is being invaded no more than if a woman doctor examines them. The suggestion implicit in the privacy argument that such behavior is unlikely on either side is an insult to the professionalism of guards and the dignity of inmates.

Case 6:10-cv-03305-RED    Document 136-1    Filed 08/26/11    Page 11 of 32

opportunities solely because of their sex.

In August 1975 the Fulton County Sheriff's Department announced seven vacancies for Deputy Sheriff I, an entry-level position with no physical or gender requirements listed in the job description. In September 1975 Hardin took the prerequisite written examination administered by the Fulton County Personnel Board and received a score of 79.47, which ranked her seventh among the seventeen applicants certified as passing the test. The list of applicants forwarded to Stynchcombe by the Personnel Board included the names of Hardin and another woman. Stynchcombe, however, did not interview or consider either female applicant. When Hardin contacted Stynchcombe to find out why she was not called in for an interview he told her the Deputy Sheriff I job openings were in the male section of the jail and that he planned to hire only men to fill those positions.

In October 1975 Hardin filed a charge of employment discrimination with the Equal Employment Opportunity Commission. Following a four day trial on the merits the district court found that Stynchcombe and the Fulton County Sheriff's Department had discriminated against Hardin on the basis of sex, but that the discrimination did not violate Title VII because sex was a bona fide occupational qualification (bfoq) for the position of Deputy Sheriff I. Hardin filed a timely notice of appeal, seeking reversal of the finding that defendants' intentional discrimination was justified.

I

Stynchcombe, the appointing authority in the Sheriff's Department, has an unwritten policy of initially assigning new deputy sheriffs to the county jail.[8] There are two bases for this assignment

---

[8]This assignment policy is not inflexible. In the past Stynchcombe has made initial assignments outside the jail and has moved deputy sheriffs out of the jail before the end of the six month period. According to the testimony of Leroy Nelson Stynchcombe, Jr., Chief Deputy Sheriff, the following deputy sheriffs were hired into "preferred" positions without serving a six month probationary stint in the Fulton County Jail: Gene Brown, thirty day temporary assignment to courthouse followed by permanent assignment to court (1971); Jesse Wallace, hired directly into courtroom; John Beach, thirty day temporary assignment to jail followed by thirty day temporary assignment to courthouse followed by permanent assignment; Daniel Blayton, initial thirty day temporary assignment to tax commissioners office; Joseph Booker, initial assignment to courthouse (1973); Gary Gettis, initial assignment to courtroom (1973); Gene Green, initial assignment to radio communication room (1973); Stynchcombe, Jr., initial assignment to courthouse; John L. Hanson, initial assignment to Juvenile Court (1972); James Kay, initial assignment to courthouse (1964); William Pitard, initial assignment to courthouse (1974); Atwood Powell, initial assignment temporary thirty days at jail, then permanent assignment; John Felder, on jail payroll but assigned to Grady Hospital; Carolyn Masson, initially assigned to the courthouse (1978).

Case 6:10-cv-03305-RED     Document 136-1     Filed 08/26/11     Page 12 of 32

policy: Stynchcombe does not like deputy sheriffs to work in the public eye until they are issued a gun and uniform at the end of a six month probationary period; and assignment of new deputy sheriffs to the undesirable jail positions maintains department morale by reserving preferred positions for employees with more seniority. Stynchcombe also has a policy of assigning only male deputy sheriffs to work in the male section of the jail, and considers hiring female deputy sheriffs only when contact positions are available in the female section of the jail. Defendants claim that this second assignment policy serves to protect the privacy rights of the inmates.[9]

The Fulton County Jail is operated under authority of the Fulton County Sheriff's Department. There are approximately 1,100 inmates in the male section and 50 inmates in the female section. The inmate population is highly transient, with an average stay of under one month. This is because the jail is a holding institution with a population comprised primarily of pretrial

---

In addition, Stynchcombe, Jr., testified that certain deputy sheriffs have in the past been allowed to furnish their own guns and uniforms.

[9] Defendants also contend that Fulton County Jail is a maximum security institution with such violent and overcrowded conditions that assignment of women deputy sheriffs to the male section would threaten the security of the jail. The district court noted that it was far from clear that the jail satisfied the Federal Bureau of Prisons definition of "maximum security institution" and supporting its finding that security would not support defendants' bfoq defense as follows:

> The majority of factors the defendants advance as making the jail inherently unsafe for women make the jail equally unsafe for men. Male guards at the jail have been verbally abused, physically assaulted, taken hostage, and defiled by inmates. Jail officials cannot make the determination that the inherent dangers of the job are acceptable for men to risk, but too hazardous for all women. Women can be trained in hand to hand combat techniques, in the use of weapons, and in riot control as readily as can men. There is no evidence that a properly trained female guard would respond any less swiftly or effectively in an emergency than a male guard, would be unable to protect herself or others, or would carry out her duty of maintaining jail security with any less vigor or ability than her male counterparts.
> ... The Fulton County Jail may be distinguished from the penitentiaries in Dothard v. Rawlinson, 433 U.S. 321 (1977), in its significantly smaller number of sex offenders and the concomitant diminishment in the threat of sexual assault.
> ... The presence of women may, in fact, contribute to the normalization of the prison environment. Female correctional officers are currently successfully employed in several state systems. There is no reason to believe that the threat of sexual assault could not be guarded against or greatly defused by alertness on the part of the female guards and by the common-sense precautionary procedures already followed at the jail to assure the protection of all the deputies. Defendants have not shown that the security of the jail requires that only men be employed as deputies in the male division.

13

detainees, witnesses in protective custody, inmates awaiting the results of an appeal and inmates held on writs to testify or stand trial. Approximately 200 inmates have been convicted and are serving relatively short sentences or are awaiting assignment to a prison.

In the male section of the jail the living quarters are divided into two floors of single occupancy and multiple occupancy cells. The multiple occupancy cells have communal shower and toilet facilities that are visible from the corridors. The single occupancy cells have toilet facilities but no showers, so inmates are removed from those cells at least three times a week in order to bathe. Those inmates dress and undress outside shower stalls in the presence of a custodial deputy and shower in stalls that have transparent plastic curtains.

Approximately forty deputy sheriffs are assigned to the male section of the jail during the day. Twenty to twenty-five deputy sheriffs work the second shift and fifteen to twenty work the third shift. These deputies answer the telephone, operate the television system, work on the floor among the inmate population and work in administration, supervision, supply, maintenance, recreation, hospital and food services. Deputy sheriffs are irregularly rotated among assignments.

All positions other than contact positions in the female living quarters are considered to be in the male section of the jail and some positions classified under the male section are not actually in the jail.

Undisputed testimony indicates that the majority of positions in the jail are noncontact positions. Depending on the number of deputies assigned to a shift, two to seven work on the floor patrolling the corridors and escorting male inmates to shower facilities. Deputy sheriffs assisting inmates to and from the recreation area twice a day may be called upon to conduct strip searches of inmates. At least three deputy sheriffs work in the booking office on the day shift, receiving and discharging inmates. These deputies perform strip searches of inmates when floor deputies are not available for that duty, but one of the three always remains in the office while the other two conduct the searches. Male booking office deputies process female inmates, but require female deputy sheriffs to conduct the requisite strip searches. Deputies assigned to other positions within the jail apparently do not routinely perform searches of inmates or patrol the corridors. In the case of emergency, however, all deputies must be available to maintain security and may have to strip search inmates. In addition to the deputies working in the male section of the jail on each shift two deputy sheriffs work in the female section. One female deputy sheriff and approximately sixty male deputy sheriffs work outside the jail in the courthouse, the juvenile court, and the warrant cars.

II

Title VII prohibits employment discrimination, which is "one of the most deplorable forms of discrimination known to our society, for it deals not with just an individual's sharing in the 'outer benefits' of being an American citizen, but rather the ability to provide decently for one's family in a job or profession for which he qualifies or chooses." *Culpepper v. Reynolds Metals Co.*, 421 F.2d

14

888, 891 (5th Cir. 1970), quoted in *Rowe v. General Motors Corp.*, 457 F.2d 348, 354 (5th Cir. 1972). The Act was designed to prohibit both overt discrimination and practices that are fair in form but discriminatory in operation. While either the disparate treatment or disparate impact theory may be applicable to a particular set of facts, the district court analyzed this case under the theory of disparate treatment. In a disparate treatment case an employer is accused of simply treating some people less favorably than others because of their race, color, religion, sex or national origin.

Stynchcombe's policy of assigning new deputies to work in the county jail where almost all positions are reserved for males all but eliminates the opportunity of women to gain employment with the Sheriff's Department.[18] In defense of this overt discrimination defendants assert that the challenged assignment policies are permitted by section 703(e) of Title VII, which allows sex based discrimination when sex is a bona fide occupational qualification. Section 703(e) provides "only the narrowest of exceptions to the general rule requiring equality of employment opportunities." *Dothard v. Rawlinson*, 433 U.S. 321 (1977); *Weeks v. Southern Bell Telephone & Telegraph Co.*, 408 F.2d 228, 232 (5th Cir. 1969). Sex based discrimination is valid only if the essence of the business would be undermined by not hiring members of one sex exclusively. *Diaz v. Pan American World Airways, Inc.*, 442 U.S. 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950 (1971). Defendants can satisfy that burden only by proving they had a factual basis for believing that all or substantially all women would be unable to safely and efficiently perform the duties of the job. Weeks, 408 F.2d at 235.[20] In addition, defendants bear the burden of proving that because of the nature of the

---

[18]The discriminatory effect of defendants' assignment policy is exacerbated by the fact that, until this lawsuit was filed, only one female deputy sheriff had been rotated out of the prison into a more desirable position. Since the suit was filed Stynchcombe has promoted three female deputies. This recent action cannot excuse his past failure to apply the assignment and rotation policies with an even hand to both male and female deputies. Cessation of employment discrimination in the face of litigation is "equivocal in purpose, motive and permanence." Jenkins v. United Gas Corp., 400 F.2d 28, 33 & n. 11 (5th Cir. 1968); accord Furnco Constr. Corp. v. Waters, 438 U.S. 567, 584 (1978) (Marshall, J., concurring in part and dissenting in part) ("It is clear that an employer cannot be relieved of responsibility for past discriminatory practices merely by undertaking affirmative action to obtain proportional representation in his work force."); International Bhd. of Teamsters v. United States, 431 U.S. 324, 341-42 (1977) ("[A] company's later changes in its hiring and promotion policies could be of little comfort to the victims of the earlier ... discrimination, and could not erase its previous illegal conduct or its obligation to afford relief to those who suffered because of it."), quoted in Furnco, 431 U.S. at 579 (majority opinion); Causey v. Ford Motor Co., 516 F.2d 416, 422 (5th Cir. 1975) (later job offer could not right earlier statutory wrong).

[20]The narrow scope of the bfoq exception does not encompass perceptions of male and female roles based upon romantic paternalism or the divine plan for the separation of the sexes.

Apparently, however, these theories have not lost credence in the Fulton County Sheriff's Department. For example, in answer to the question, "Do you have any opinion as to the role of women in the Fulton County Sheriff's Department?" Stynchcombe replied: "Well, the answer

15

would be I am not prejudice against women period. In fact, if anything, I have leaned over backwards to help them out. I love them." And, in response to the question, "Does the Sheriff's Department work under any [gender based] affirmative action plan or policy now?" he replied:

Well, the only--the one and only, if you want to call it sex bias or whatever you call it, is what this whole case is all about. Not but one place that I haven't got--I will say I don't want a woman working and I give them the reason is in the men's sleeping quarters of the jail.

If that is discrimination I don't know it but if you feel like calling it that, that is okay. That is the only one I got.

It is not discrimination but I got good reason for the way I am thinking. It is not because of the women. I know I wouldn't want my daughter or my wife to hold that kind of job.

That Stynchcombe is not the only member of the Fulton County Sheriff's Department to believe that protecting women from the harsher things in life does not constitute discrimination is indicated by the following excerpts from the trial transcript:

THE COURT: You feel that everybody in the jail should be prepared in an emergency to do anything that anybody else can do?

THE WITNESS: I certainly do.

....

THE COURT: Why couldn't a woman do this?

THE WITNESS: Because, I have told you before, Judge, I just believe the woman a hazard to us to have a lady involved in such as that. I am not prejudiced.

THE COURT: I know.

THE WITNESS: But I would like to make a point. I am a firm believer that God created a lady for man to love and to cherish, and I cannot imagine any woman wanting to put herself in the position of a man. I am not prejudiced, but I cannot see that, I guess maybe that is the way I was brought up, your Honor.

THE COURT: Well, the law has been changed.

Testimony of Deputy Sheriff Clifford M. Hufstetler, Assistant Watch Commander and Lieutenant in Charge of Security on the day watch.

Q. Chief, you indicated that you would have no objections of hiring women to serve in positions in the men's section of the jail, is that right?

A. No, I don't think I said that. I don't think that if it was left to me, this is just one man's opinion, and I may not like what you say, but I'd defend with my life your right to say it, one man's opinion, I am of the opinion that the job is a little too sticky for a female. I can't conceive within my mind how she could tolerate it, of course, that is one big word, perseverance is another big word; but I see inmates out there that can tolerate more than, you know, your tolerance means a lot psychologically, and I don't see how her tolerance would--she would have to be a giant in that sense.

....

Q. You indicated that there was psychologically and socially men understand men and women understand women. Could you give the Court some explanation of what you

16

operation of the business they could not rearrange job responsibilities in a way that would eliminate the clash between the privacy interests of the inmates and the employment opportunities of female deputy sheriffs.

This court finds that as a matter of law the evidence produced by defendants is insufficient to sustain their bfoq defense. The conclusion of the district court to the contrary is clearly erroneous.

The first component of the challenged assignment policy is that of initially assigning deputy sheriffs to the jail for six months before allowing them to work in other positions in the Sheriff's Department. Stynchcombe admits that this policy is not necessary to provide new deputies with training for other Deputy Sheriff I positions such as courthouse deputy. Rather, the purposes allegedly served by assigning new deputies to the jail are to keep the public from coming into contact with deputies who have not been issued guns or uniforms and to enhance department morale by reserving desirable positions outside the jail for deputies with more seniority.

Defendants have failed to prove that it is of the essence of the business of the Sheriff's Department to assign deputies to the county jail for six months. Stynchcombe has waived the policy on a number of occasions without apparent detriment to the Department. He has in the past hired both male and female deputy sheriffs without requiring them to work in the jail, and has allowed new deputy sheriffs to provide their own uniforms and weapons. There is nothing to prevent a continuation of that practice. In addition, while Stynchcombe's desire to reserve preferred positions outside the jail for more senior deputies might be compelling in the context of a bona fide seniority system arrived at through collective bargaining, it cannot justify this informal assignment policy which all but bars women from the Sheriff's Department.

The second component of the challenged employment practice is that of assigning only male deputies to work in the male section of the jail and of considering females for deputy sheriff

_____

mean by that?
A. Well, there has been a psychological difference since time immorial [sic] when God created Adam and Eve, there was a difference. He first created Adam, then he took Adam's rib and made Eve. When they sinned, when I read the Bible, when God walked in the garden, he didn't say anything to Eve, he said Adam, where art thou? He admonished Adam, didn't he?
Q. So you relate Genesis to your assignment policy of the jail?
A. Not necessarily Genesis, I relate Isaiah, I relate Daniel, I relate Leviticus, I can call all sixty-six books in the Bible. I relate Jesus Christ above, we live, move and have our being in Him.
Testimony of L.B. Eason, Chief Jailer, who is responsible for management of the jail and assignment of personnel.

positions only when there are openings in the female section of the jail. Defendants assert that hiring women to work as deputy sheriffs in the male section of the jail would violate the privacy rights of the prisoners and that any adjustment of job assignments designed to protect both the Title VII guarantee of freedom from employment discrimination and the privacy of the inmates would be unfair to male deputy sheriffs.

Although incarceration or pretrial detention is necessarily accompanied by the loss or restriction of certain rights and privileges, including the right to privacy, an inmate retains those constitutional rights that are not inconsistent with prisoner status. See, e.g., *Bell v. Wolfish*, 441 U.S. 520, 545-48 (1979). While it is important to maintain order and security within the jail through surveillance and search of inmates by deputy sheriffs the inmates' retained privacy rights may be unnecessarily invaded by having deputies of the opposite sex conduct strip or body cavity searches, or oversee use of toilet and shower facilities.

Hardin is not seeking assignment to duties that would infringe upon inmate privacy, however. Since the majority of the deputy sheriff positions in the male section of the jail do not require performance of strip searches or observation of inmates' use of shower or toilet facilities, it appears that modification of the system of rotating deputy sheriff assignments will avoid the clash between privacy rights and equal employment opportunities without either substantially affecting the efficient operation of the Sheriff's Department or undermining its essential functions. In other correctional institutions it has been found possible to preserve the privacy of inmates while employing guards or correctional officers of the opposite sex, and defendants have failed to prove that similar accommodations cannot be made in this case. This burden of proof is not met by defendants' assertion that all jail personnel must be available to assist in emergencies, regardless of sex.[26] Of course, if Hardin is assigned to a position outside the jail inmate privacy rights will not be implicated.

Defendants have failed to prove that it is essential to the functioning of the Sheriff's Department that all new Deputy Sheriffs I be initially assigned to the Fulton County Jail. Defendants have also failed to prove that they cannot rearrange job responsibilities so that female deputies assigned to the male section of the jail will not have to perform duties that impinge upon inmate privacy rights. Failure of proof concerning either component of the assignment policy, standing alone, would be sufficient grounds for this court's decision to reverse the district court's opinion holding that sex is a bfoq for the position of Deputy Sheriff I.

---

[26] Defendants also argue that making selective work assignment of female deputy sheriffs will discriminate against male deputies. If defendants' allegations were established, this argument would raise serious questions. We conclude, however, that defendants have not met their burden of proof on this issue. Since Stynchcombe also asserts that female deputy sheriffs working in the jail have the "softest job in the Sheriff's Department," accord Testimony of L.B. Eason, Chief Jailer, it would appear that selective job assignment of female deputies within the male section of the jail and elsewhere in the Sheriff's Department will serve to equalize the duties of female and male deputy sheriffs.

18

This court does not purport to dictate to the defendants the proper job assignments for Fulton County deputies. We hold only that the bfoq exception to Title VII does not justify defendants' arbitrary practice of funneling deputy sheriffs through positions reserved almost exclusively for males. The judgment of the district court is accordingly reversed and the case is remanded for further proceedings.

## NOTES AND COMMENTS ON THE BFOQ DEFENSE

1.      Both *Dothard* and *Hardin* reversed findings of trial judges. Did those judges make clearly erroneous factual findings or misconceive governing law?

2.      *Dothard* may be less a bfoq case than a prison law case. The Supreme Court accords extraordinary deference to prison authorities in prison administration. What is the evidentiary basis in *Dothard* justifying the decision by Alabama authorities, who had the burden of persuasion on the issue, to sex segregate contact positions?

3.      We defer for later consideration the use of the BFOQ defense in conjunction with the disparate treatment of pregnant women. Becaue section 702 exempts from Title VII religious discrimination by religious organizations, the BFOQ rarely arises in religious discrimination litigation. But with the return of religion to public life in recent years, that may change as like minded co-religionists assert the right to exclude nonbelievers from employment in seemingly secular occupations. How should the courts respond?

4.      By statute, race cannot be a bona fide occupational qualification, reflecting a consensus that race is altogether irrelevant to ability. In narrow circumstances, the first amendment may trump Title VII, permitting the director of an artistic production to take race into account in casting for Othello, but those cases are sufficiently rare that they are more properly the subject of a course in First Amendment law.

5.      When should sex be a bfoq? When the essential function of the job is to lawfully sell sex (e.g., exotic dancers), sex is understood to be a bfoq. The recent controversy over the restaurant chain "Hooters" raises the question of how to draw the line between customer preference (never a bfoq) and the sale of sex. What is the essential function of a "Hooters Girl?" Does she serve food and beverages or sex? Do you understand the reluctance of the chain to answer that question?

6.      The prison cases refer to the more common basis for the assertion of sex as a BFOQ -- privacy. Both the biological differences between men and women and the social significance we attach to them compel the recognition that customer/client privacy can justify sex specific employment. Prisons are one of the growth industries of our generation; can prisons rely on the privacy expectations of inmates to sex segregate jobs within the inmate section of a prison. The next case answers that question.

## JOHNSON v. PHELAN

### 69 F.3d 144 (7th Cir. 1995)

EASTERBROOK, Circuit Judge.

Albert Johnson brought this suit under 42 U.S.C. § 1983. According to his complaint, which the district court dismissed for failure to state a claim on which relief may be granted, female guards at the Cook County Jail are assigned to monitor male prisoners' movements and can see men naked in their cells, the shower, and the toilet. Johnson sought damages from persons including the President of the Cook County Board and the Chairman of the County's Buildings and Zoning Commission. Johnson has abandoned on appeal any contention that monitoring in the local courthouse lockup's bathroom violates the Constitution. But his argument that cross-sex monitoring in the Jail violates the due process clause requires additional discussion in light of *Canedy v. Boardman*, 16 F.3d 183 (7th Cir.1994), which holds that a right of privacy limits the ability of wardens to subject men to body searches by women, or the reverse. Our case involves visual rather than tactile inspections, and we must decide whether male prisoners are entitled to prevent female guards from watching them while undressed.

Observation is a form of search, and the initial question therefore is whether monitoring is "unreasonable" under the fourth amendment. So the Supreme Court conceived the issue in *Bell v. Wolfish*, 441 U.S. 520 (1979), where a pretrial detainee argued that routine inspections of his body cavities violated the Constitution. The Court held that these searches are "reasonable" because they are prudent precautions against smuggling drugs and other contraband into prison. Prisoners argued that metal detectors plus supervision of inmates' contacts with outsiders would be superior to body-cavity inspections. The Court replied that prisons need not adopt the best alternatives. Less-restrictive-alternative arguments are too powerful: a prison always can do something, at some cost, to make prisons more habitable, but if courts assess and compare these costs and benefits then judges rather than wardens are the real prison administrators. *Wolfish* emphasized what is the animating theme of the Court's prison jurisprudence for the last 20 years: the requirement that judges respect hard choices made by prison administrators. E.g., *Sandin v. Conner*, 515 U.S. 472 (1995); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119 (1977); *Wolff v. McDonnell*, 418 U.S. (1974).

Wolfish assumed without deciding that prisoners retain some right of privacy under the fourth amendment. Five years later the Court held that they do not. *Hudson v. Palmer*, 468 U.S. 517, 526-30 (1984), observes that privacy is the thing most surely extinguished by a judgment committing someone to prison. Guards take control of where and how prisoners live; they do not retain any right of seclusion or secrecy against their captors, who are entitled to watch and regulate every detail of daily life. After Wolfish and Hudson monitoring of naked prisoners is not only permissible--wardens are entitled to take precautions against drugs and weapons (which can be passed through the alimentary canal or hidden in the rectal cavity and collected from a toilet bowl)--but also sometimes mandatory. Inter-prisoner violence is endemic, so constant vigilance without

Case 6:10-cv-03305-RED     Document 136-1     Filed 08/26/11     Page 20 of 32

regard to the state of the prisoners' dress is essential. Vigilance over showers, vigilance over cells-- vigilance everywhere, which means that guards gaze upon naked inmates.

Johnson mentions the fourth amendment but ignores *Wolfish* and *Hudson*. His principal argument uses the due process clause; and because he does not seek a hearing, he is invoking principles of substantive due process. Yet courts should not reverse the outcome of a fourth amendment analysis in the name of substantive due process. *Graham v. Connor*, 490 U.S. 386 (1989), and *Albright v. Oliver*, 510 U.S. 266 (1994), hold that substantive due process is not an appropriate substitute for analysis under provisions of the Constitution that address a subject directly, and in particular does not trump the fourth amendment. "Privacy" has too many other connotations-- from the right of reproductive autonomy that has nothing to do with searches and seizures to the common law right to control the publication of certain facts about oneself, including the depiction of one's naked body, see *Haynes v. Alfred A. Knopf, Inc.,* 8 F.3d 1222, 1229-30 (7th Cir.1993)--to be a useful substitute for the fourth amendment (or, as we discuss below, the eighth).

What is more, moving ground from the fourth amendment to the fifth would not help Johnson. Under the due process clause the question is whether the regulation is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78 (1987). Surveillance of prisoners is essential, as *Wolfish* establishes. Observation of cells, showers, and toilets is less intrusive than the body- cavity inspections *Wolfish* held permissible. Guards do the surveillance. Male guards and female guards too--for Title VII of the Civil Rights Act of 1964 opens prisons to women and requires states to hire them unless sex is a bona fide occupational qualification, a high standard of necessity. *Dothard v. Rawlinson*, 433 U.S. 321 (1977); *United States v. Gregory*, 818 F.2d 1114 (4th Cir.1987) (rejecting an argument that a desire to curtail cross-sex monitoring of naked prisoners makes sex a bona fide occupation qualification for prison guards); see also *United Auto Workers v. Johnson Controls, Inc.*, 499 U.S. 187 (1991). Unless female guards are shuffled off to back office jobs, itself problematic under Title VII, they are bound to see the male prisoners in states of undress. Frequently. Deliberately. Otherwise they are not doing their jobs. *Smith v. Fairman*, 678 F.2d 52 (7th Cir.1982), puts two and two together, holding that in light of Title VII female guards are entitled to participate in the normal activities of guarding, including pat-down searches of male inmates. We held in *Torres v. Wisconsin Department of Health & Social Services*, 859 F.2d 1523 (7th Cir.1988) (en banc), a case filed by guards under Title VII, that a state could exclude men from one of its four prisons, in order to promote the female prisoners' rehabilitation. *Torres* did not say that the Constitution requires this exclusion; instead we deferred to the judgment of prison administrators that they needed to limit cross-sex monitoring to achieve penological objectives. Today deference leads to the opposite result: Cook County does not believe that cross-sex monitoring imperils its mission, and evenhanded willingness to accept prison administrators' decisions about debatable issues means that Johnson cannot prevail under the due process clause.

After holding in *Hudson* that prisoners lack any reasonable expectation of privacy under the fourth amendment, the Court remarked that a prisoner could use the eighth amendment to overcome "calculated harassment unrelated to prison needs." 468 U.S. at 530. Similarly, the Court observed in *Graham* that the eighth amendment offers some protection supplementary to the fourth. 490 U.S.

Case 6:10-cv-03305-RED    Document 136-1    Filed 08/26/11    Page 21 of 32

at 392, 394. We therefore think it best to understand the references to "privacy" in *Canedy* and similar cases as invocations of the eighth amendment's ban on cruel and unusual punishments.

Johnson's complaint (and the brief filed on his behalf in this court by a top- notch law firm) do not allege either particular susceptibility or any design to inflict psychological injury. A prisoner could say that he is especially shy-- perhaps required by his religion to remain dressed in the presence of the opposite sex—and that the guards, knowing this, tormented him by assigning women to watch the toilets and showers. So, too, a prisoner has a remedy for deliberate harassment, on account of sex, by guards of either sex. Johnson does not allege this or anything like it. His case therefore does not present the sort of claim that *Hudson* holds in reserve. It does not satisfy the more general requirements of the eighth amendment either.

One who makes a claim under the cruel and unusual punishments clause must show that the state has created risk or inflicted pain pointlessly. "After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (internal quotations omitted). See also *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991); *Helling v. McKinney*, 509 U.S. 25 (1993). Does cross-sex monitoring serve a function beyond the infliction of pain? Monitoring is vital, but how about the cross-sex part? For this there are two justifications.

First, it makes good use of the staff. It is more expensive for a prison to have a group of guards dedicated to shower and toilet monitoring (equivalently, a group that can do every function except this) than to have guards all of whom can serve each role in the prison. If only men can monitor showers, then female guards are less useful to the prison; if female guards can't perform this task, the prison must have more guards on hand to cover for them. It is a form of featherbedding. *O'Lone* held that an interest in the efficient deployment of the staff permits the prison to block inmates from attending religious services, although religion has powerful protection in the first amendment. Similarly, an interest in efficient deployment of the staff supports cross-sex monitoring. See *Timm v. Gunter*, 917 F.2d 1093, 1102 (8th Cir.1990), which concludes that "opposite-sex surveillance of male inmates, performed on the same basis as same-sex surveillance," is constitutionally permissible. By the same token, the prison may assign homosexual male guards to monitor male prisoners, heterosexual male guards to monitor effeminate male homosexual prisoners, and so on. There are too many permutations to place guards and prisoners into multiple classes by sex, sexual orientation, and perhaps other criteria, allowing each group to be observed only by the corresponding groups that occasion the least unhappiness.

Second, cross-sex monitoring reduces the need for prisons to make sex a criterion of employment, and therefore reduces the potential for conflict with Title VII and the equal protection clause. Cells and showers are designed so that guards can see in, to prevent violence and other offenses. Prisoners dress, undress, and bathe under watchful eyes. Guards roaming the corridors are bound to see naked prisoners. A prison could comply with the rule Johnson proposes, and still maintain surveillance, only by relegating women to the administrative wing, limiting their duties (thereby raising the cost of the guard complement), or eliminating them from the staff.

22

To the riposte that Title VII and the equal protection clause can't authorize a violation of the eighth amendment, we rejoin: True enough, but not pertinent. A warden must accommodate conflicting interests--the embarrassment of reticent prisoners, the entitlement of women to equal treatment in the workplace. A state may reject the prisoner's claim if it has a reason, as Wolfish establishes for a substantially greater intrusion. The interest of women in equal treatment is a solid reason, with more secure footing in American law than prisoners' modesty, leading to the conclusion that there is no violation of the eighth amendment. We held as much already in *Smith v. Fairman*. When interests clash, a judge must prefer those based on legislative decisions over those that reflect their own views of sound policy. The premise of judicial review is that the Constitution is an authoritative decision binding on all branches of government; when it has only such substance as judges pour into it themselves, the decisions of the elected branches prevail. *Canedy* accordingly avowed reluctance to do more than forbid cross- sex body searches, 16 F.3d at 187, which it conceived as pointless debasement. Anonymous visual inspections from afar are considerably less intrusive and carry less potential for "the unnecessary and wanton infliction of pain". To the extent incautious language in Canedy implies that deliberate visual inspections are indistinguishable from physical palpitations, its discussion is dictum. Further reflection leads us to conclude that it should not be converted to a holding.

How odd it would be to find in the eighth amendment a right not to be seen by the other sex. Physicians and nurses of one sex routinely examine the other. In exotic places such as California people regularly sit in saunas and hot tubs with unclothed strangers. Cf. *Miller v. South Bend*, 904 F.2d 1081 (7th Cir.1990) (en banc) (holding that there is a constitutional right to dance nude in public), reversed under the name *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). Most persons' aversion to public nudity pales compared with the taboo against detailed inspections of body cavities, yet the Court found no constitutional obstacle to these in *Wolfish*; the Constitution does not require prison managers to respect the social conventions of free society. Drug testing is common, although this often requires observation of urination. *Vernonia School District 47J v. Acton*, 115 S.Ct. 2386 (1995) (drug testing of seventh grade boy as condition of participation in sports is "reasonable" under the fourth amendment). More to the point, the clash between modesty and equal employment opportunities has been played out in sports. Women reporters routinely enter locker rooms after games. How could an imposition that male athletes tolerate be deemed cruel and unusual punishment?

Some cases say that the Constitution forbids deliberate cross-sex monitoring (as opposed to infrequent or accidental sightings). See *Cornwell v. Dahlberg*, 963 F.2d 912, 916-17 (6th Cir.1992) (basing this conclusion on the fourth amendment, but without mentioning Hudson); *Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir.1981) (decided three years before Hudson). Decisions such as *Timm* and *Grummett v. Rushen*, 779 F.2d 491 (9th Cir.1985), which hold that cross-sex monitoring is constitutional, could be treated as fact-bound, although some of their language is unqualified (we have quoted such a passage from *Timm*). Each emphasized that the female guards' views were not universally unobstructed. But if this is important (and we do not think it is), Johnson's own complaint brings the case within the scope of *Timm*. Johnson alleges that

23

when a female correctional officer is assigned to work a dorm it is her duty and responsibility to make counts, also to constantly supervise all inmates in the dorms, making periodic, unannounced spot checks of inmates in their living area, and s[u]rveying in the remainder of the area such as the general toilet, and shower facilities, which is in an open unobstructed area, except by a thin sheet that can be seen through.

Thus Johnson tells us that the Jail offers some, but imperfect, shielding from guards' observation, exactly the situation that the eighth circuit held permissible in *Timm*. We agree with that conclusion. See also *Jordan v. Gardner*, 986 F.2d at 1545-67 (Wallace, Wiggins, Trott & Kleinfeld, JJ., dissenting).

Any practice allowed under the due process analysis of *Turner* is acceptable under the eighth amendment too--not only because the objective component of cruel and unusual punishment is more tolerant toward wardens, but also because the eighth amendment has a demanding mental-state component. *Farmer v. Brennan*, 511 U.S. 825 (1994), holds that the standard is criminal recklessness. The guard or warden must want to injure the prisoner or must know of and disregard a substantial risk that harm will befall the prisoner. Johnson does not allege that any of the defendants sought to humiliate him. Although he filed the complaint pro se, his lawyer did not add this allegation to the brief and showed no inclination to advance it when pressed at oral argument. Of course, we must grant Johnson the benefit of all allegations in the complaint and everything he might prove consistent with that document. The district court assumed that the cross-sex viewing was inadvertent, an inappropriate step when evaluating a complaint under Rule 12(b)(6). But what Johnson wants to show is not that the defendants adopted their policy to cause injury, but that they ignored his sensibilities. He must believe it sufficient to show that they acted deliberately.

Put the eighth amendment aside for a moment and consider the question whether a "deliberate" decision--that is, a considered choice with knowledge of the consequences--establishes "intent" for purposes of constitutional provisions containing a mental-state ingredient. That question has been before the Supreme Court many times, and the answer is "no." A good example is *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979), apropos because it deals with sex discrimination. Massachusetts decided to give military veterans an absolute, lifetime preference in employment. Approximately 98% of veterans are male, and as a result the bureaucracy is overwhelmingly male. A three-judge district court held the preference unconstitutional. Recognizing that the equal protection clause forbids only disparate treatment, and not disparate impact, see *Washington v. Davis*, 426 U.S. 229 (1976), the district court observed that people are deemed to intend the natural and probable consequences of their acts. Massachusetts adopted the preference deliberately, and it maintained the preference after recognizing that it excluded many qualified women from the civil service. The Supreme Court acknowledged all of this but held that deliberate acts, with knowledge of the consequences, do not establish "intent" in the constitutional sense--for, if they did, then the distinction between disparate treatment and disparate impact would collapse as soon as anyone informed the decisionmaker of the impact. After a canvass of its cases, the Court concluded:

> "Discriminatory purpose" ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

442 U.S. at 279 (citation and footnotes omitted). Since *Feeney* the distinction between choices made "because" the decisionmaker wants to achieve particular consequences, and those "in spite of" unwelcome effects, has been a staple of constitutional law.

Wardens make many choices that have unpleasant consequences for prisoners, and frequently wardens wish that they could do things differently. Budgetary shortfalls may dictate that prisoners live in cramped conditions, even though wardens know that penological purposes would be better served by additional space. The question whether a deliberate choice to put two prisoners in a cell with only 100 square feet of space satisfied the intent component of the eighth amendment came up in *Wilson v. Seiter*. Prisoners alleged that the dilapidated facility had "overcrowding, excessive noise, insufficient locker storage space, inadequate heating and cooling, improper ventilation, unclean and inadequate restrooms, unsanitary dining facilities and food preparation, and housing [of regular inmates] with mentally and physically ill inmates." 501 U.S. at 296. The warden knew all about this, and official decisions led to the problems--for example, the state spent money on guards' salaries rather than better food facilities. The Court assumed that conditions at the prison fell below objectively permissible standards but held that the prisoners had not demonstrated the essential mental state.

To put this differently, the question in *Wilson* was whether the mental-state requirement applies to systemic conditions, which affect all prisoners. The Court answered yes, acknowledging that this could perpetuate some unwelcome conditions:

> The United States suggests that a state-of-mind inquiry might allow officials to interpose the defense that, despite good-faith efforts to obtain funding, fiscal constraints beyond their control prevent the elimination of inhumane conditions. Even if that were so, it is hard to understand how it could control the meaning of "cruel and unusual punishment" in the Eighth Amendment. An intent requirement is either implicit in the word "punishment" or is not; it cannot be alternately required and ignored as policy conditions might dictate.

501 U.S. at 301-02. "If the pain inflicted is not formally meted out as punishment by the statute or sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." Id. at 300. No intent to injure means no "punishment"; and no "punishment," no violation.

Let us test this with an illustration. Suppose the warden decides to issue guns to the guards, a step that in the absence of an ongoing riot violates contemporary norms because weapons create risks. Prisoners may seize them and shoot the guards or each other; guards may discharge them accidentally, injuring the prisoners. The decision to issue the guns is deliberate, and everyone knows that some injuries will follow. The warden hopes that a reduction in violence within the prison will

compensate for the new risk. Can a prisoner obtain an injunction excluding guns from the prison on the ground that the risk exceeds the anticipated benefits? Or suppose the inevitable happens: a guard shoots a prisoner. Has the warden violated the eighth amendment? The answer from *Whitley* is "no," because the warden did not want harm to come to the prisoners and adopted the policy in an attempt to reduce violence. The policy was not designed to punish anyone and therefore, under *Whitley*, *Wilson*, and *Farmer*, does not violate the eighth amendment. A warden displays "deliberate indifference" only if he ignores the costs to prisoners, excluding them from the calculus of costs and benefits, or if he allows guns into the prison because he wants prisoners to suffer. An incorrect assessment of recognized costs and benefits is just negligence, which does not violate the fifth amendment (even if "gross,") and does not violate the eighth amendment either. Yet this gun policy is deliberate in the same sense as the policy permitting cross-sex monitoring, and injury is as predictable as the existence of embarrassed inmates.

Where does this leave us? The fourth amendment does not protect privacy interests within prisons. Moving to other amendments does not change the outcome. Cross-sex monitoring is not a senseless imposition. As a reconciliation of conflicting entitlements and desires, it satisfies the Turner standard. It cannot be called "inhumane" and therefore does not fall below the floor set by the objective component of the eighth amendment. And Johnson does not contend that his captors adopted their monitoring patterns because of, rather than in spite of, the embarrassment it causes some prisoners. He does not submit that the warden ignored his sensibilities; he argues only that they received too little weight in the felicific calculus. Like the district court, therefore, we conclude that the complaint fails to state a claim on which relief may be granted.

AFFIRMED.

POSNER, Chief Judge, concurring and dissenting.

I agree with the district judge and my colleagues that Johnson's equal protection claim has no possible merit, that there is no possible basis for imputing liability to the president of the Cook County Board of Commissioners, and that the claims against the defendants in their official capacities must be dismissed as unauthorized suits against the State of Illinois. That is where my agreement ends.

The cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, like so much in the Bill of Rights, is a Rorschach test. What the judge sees in it is the reflection of his or her own values, values shaped by personal experience and temperament as well as by historical reflection, public opinion, and other sources of moral judgment. No other theory of constitutional interpretation can explain the elaborate edifice of death-penalty jurisprudence that the Supreme Court has erected in the name of the Eighth Amendment. Or the interpretation of the amendment as a charter, however limited, of the rights of prisoners. The limitations imposed by the amendment might be thought, indeed were thought for more than 150 years after the amendment was adopted, to end with the sentence, leaving the management of prisons, the informal "punishment" meted out by brutal guards, constitutionally unregulated.

26

The critical values, in giving content to the Eighth Amendment, are those of the Justices of the Supreme Court. My colleagues believe that the Justices have spoken to the issue presented by this case. I think that they have not, and I shall try to show this. But I want first to lay out the essential background of facts and values on which I believe the judgment in this case must ultimately turn.

There are different ways to look upon the inmates of prisons and jails in the United States in 1995. One way is to look upon them as members of a different species, indeed as a type of vermin, devoid of human dignity and entitled to no respect; and then no issue concerning the degrading or brutalizing treatment of prisoners would arise. In particular there would be no inhibitions about using prisoners as the subject of experiments, including social experiments such as the experiment of seeing whether the sexes can be made interchangeable. The parading of naked male inmates in front of female guards, or of naked female inmates in front of male guards, would be no more problematic than "cross-sex surveillance" in a kennel.

I do not myself consider the 1.5 million inmates of American prisons and jails in that light. This is a non-negligible fraction of the American population. And it is only the current inmate population. The fraction of the total population that has spent time in a prison or jail is larger, although I do not know how large. A substantial number of these prison and jail inmates, including the plaintiff in this case, have not been convicted of a crime. They are merely charged with crime, and awaiting trial. Some of them may actually be innocent. Of the guilty, many are guilty of sumptuary offenses, or of other victimless crimes uncannily similar to lawful activity (gambling offenses are an example), or of esoteric financial and regulatory offenses (such as violation of the migratory game laws) some of which do not even require a guilty intent. It is wrong to break even foolish laws, or wise laws that should carry only civil penalties. It is wrongful to break the law even when the lawbreaker is flawed, weak, retarded, unstable, ignorant, brutalized, or profoundly disadvantaged, rather than violent, vicious, or evil to the core. But we should have a realistic conception of the composition of the prison and jail population before deciding that they are a scum entitled to nothing better than what a vengeful populace and a resource- starved penal system choose to give them. We must not exaggerate the distance between "us," the lawful ones, the respectable ones, and the prison and jail population; for such exaggeration will make it too easy for us to deny that population the rudiments of humane consideration.

The nudity taboo retains great strength in the United States. It should not be confused with prudery. It is a taboo against being seen in the nude by strangers, not by one's intimates. Ours is a morally diverse populace and the nudity taboo is not of uniform strength across it. It is strongest among professing Christians, because of the historical antipathy of the Church to nudity; and as it happens the plaintiff alleges that his right "to practice Ch [r]istian modesty is being violated." The taboo is particularly strong when the stranger belongs to the opposite sex. There are radical feminists who regard "sex" as a social construction and the very concept of "the opposite sex," implying as it does the dichotomization of the "sexes" (the "genders," as we are being taught to say), as a sign of patriarchy. For these feminists the surveillance of naked male prisoners by female guards and naked female prisoners by male guards are way stations on the road to sexual equality. If prisoners have

27

no rights, the reconceptualization of the prison as a site of progressive social engineering should give us no qualms. Animals have no right to wear clothing. Why prisoners, if they are no better than animals? There is no answer, if the premise is accepted. But it should be rejected, and if it is rejected, and the duty of a society that would like to think of itself as civilized to treat its prisoners humanely therefore acknowledged, then I think that the interest of a prisoner in being free from unnecessary cross-sex surveillance has priority over the unisex-bathroom movement and requires us to reverse the judgment of the district court throwing out this lawsuit.

I have been painting in broad strokes, and it is time to consider the particulars of this case and the state of the precedents. Albert Johnson, a pretrial detainee in the Cook County Jail, complains that female guards were allowed to watch his naked body while he showered and used the toilet. All we have is the complaint, which my colleagues want to dismiss without giving Johnson a chance to develop the facts. The main issue raised by the appeal is whether a prisoner has an interest that the Constitution protects in hiding his naked body from guards of the opposite sex. A subordinate issue is whether, if so, the complaint--which Johnson drafted without assistance of counsel-- sufficiently alleges deliberate as distinct from merely accidental exposure to survive dismissal.

The parties have confused the first issue by describing it as the extent of a prisoner's "right of privacy." They cannot be criticized too harshly for this. The problem is that the term "right of privacy" bears meanings in law that are remote from its primary ordinary-language meaning, which happens to be the meaning that a suit of this sort invokes. One thing it means in law is the right to reproductive autonomy; another is a congeries of tort rights only one of which relates to the naked body; still another is the right to maintain the confidentiality of certain documents and conversations. Another and overlapping meaning is the set of interests protected by the Fourth Amendment, which prohibits unreasonable searches and seizures.

One part of the tort right of privacy is the right to prevent the publicizing of intimate facts, including the sight of the naked body. Even this right is not the basis of Johnson's suit. This is not a common law tort suit, and anyway the sight of his naked body was not "publicized" in the sense that this term bears in the law of torts.

*Whalen v. Roe*, 429 U.S. 589 (1977), while holding that a statute which required keeping a record of the names of people for whom physicians prescribed certain dangerous though lawful drugs did not invade any constitutional right of privacy, can be read to imply that the disclosure by or under the compulsion of the government of a person's medical records might invade a constitutional right of privacy, presumably a "substantive due process" right. "Disclosure" of the person's naked body might be argued to violate a cognate right to the concealment of the body. In this way a right to "privacy" in the rather literal sense in which it is invoked here might laboriously be extracted from constitutional precedent.

I consider this too tortuous and uncertain a route to follow in the quest for constitutional limitations on the infliction of humiliation on prison inmates. The Eighth Amendment forbids the federal government (and by an interpretation of the due process clause of the Fourteenth Amendment

28

the states as well) to inflict cruel and unusual punishments. The due process clause has been interpreted to lay a similar prohibition on the infliction of cruel and unusual punishments on pretrial detainees who, like Johnson, not having been convicted, are not formally being "punished." The question is then whether exposing naked prisoners to guards of the opposite sex can ever be deemed one of these cruel and unusual psychological punishments. The Sixth Circuit held in *Kent v. Johnson*, 821 F.2d 1220, 1227 (6th Cir.1987), that it can be, and did not retract the holding in its order on rehearing, although it did retract any suggestion that cross-sex surveillance was unconstitutional per se. See Id. at 1229. My colleagues do not suggest that recasting Johnson's right of privacy claim as a claim under the Eighth Amendment can prejudice the state. The substance of the analysis is unchanged, and the parties in their briefs cite Eighth Amendment cases interchangeably with right of privacy cases.

I have no patience with the suggestion that Title VII of the Civil Right Act of 1964 forbids a prison or jail to impede, however slightly, the career opportunities of female guards by shielding naked male prisoners from their eyes. It is true that since the male prison population is vastly greater than the female, female guards would gain no corresponding advantage from being allowed to monopolize the surveillance of naked female prisoners. But Title VII cannot override the Constitution. There cannot be a right to inflict cruel and unusual punishments in order to secure a merely statutory entitlement to equal opportunities for women in the field of corrections. Although the equal protection clause of the Fourteenth Amendment has been held to protect women against sex discrimination by a state and the Cook County jail is an arm of the State of Illinois, the clause is not plausibly interpreted to license the infliction of cruel and unusual punishments. Just as it would not be a defense to a charge that the rack and thumbscrew are forms of cruel and unusual punishment to demonstrate that they are cheaper than imprisonment, so it is not a defense to the infliction of cruel and unusual psychological punishments that they advance women's career opportunities. And this is assuming that the interests of women would be advanced by a rule, implicit in my colleagues' decision, that gave no legal protection to female prisoners from the prying eyes of male guards; for Title VII and the equal protection clause are considered to protect men as well as women from sex discrimination.

This is not to say that exposing the naked male body to women's eyes constitutes cruel and unusual punishment in all circumstances. A male prisoner has no constitutional right to be treated by a male doctor. Men have long been attended in hospitals by female nurses, and latterly by female doctors as well. Even the "right of privacy" cases reject the suggestion that any time a female guard glimpses a naked male prisoner his rights have been invaded. Not only is the injury from an occasional glimpse slight; but in addition, as we can see when the "right of privacy" cases are reclassified under the proper constitutional rubrics, neither the Eighth Amendment nor the counterpart protections of pretrial detainees under the due process clauses extend to unintentional wrongs. Deliberately to place male prisoners under continuous visual surveillance by female guards, however, so that whenever the prisoner dresses or undresses, takes a shower, or uses the toilet, a woman is watching him, gives even my colleagues pause.

Ours is the intermediate case, where the prison or jail makes no effort, or a patently

29

inadequate effort, to shield the male prisoners from the gaze of female guards when the prisoners are nude. No case holds that the surveillance of naked inmates by guards of the opposite case is lawful per se--not *Timm v. Gunter*, 917 F.2d 1093, 1101-02 (8th Cir.1990), and not *Hudson v. Palmer*, supra, which held only that the right of privacy protected by the Fourth Amendment does not extend to prisoners, and not, as I shall show, *Bell v. Wolfish*. I infer from their discussion of Torres v. *Wisconsin Dept. of Health & Social Services*, 859 F.2d 1523 (7th Cir.1988) (en banc), that my colleagues believe that female inmates have no constitutionally protected interest in not being seen in the nude by male guards. This surprises me. *Jordan v. Gardner*, supra, is against this view, and no case supports it.

I have stated the interest at issue in this case as not being seen nude by a guard of the opposite sex, not only because most people are more embarrassed in that situation but also because the right of prisons and jails to maintain visual surveillance of potentially dangerous prisoners even when naked cannot be doubted in light of the serious security problems in many American prisons and jails today. What is in question is the right of prison officials to entrust the surveillance of naked prisoners to guards of the opposite sex from the prisoners. Bell v. Wolfish, supra, holds that pretrial detainees may be subjected to digital and visual inspection of the rectum for concealed weapons or other contraband. It does not follow that no constitutional issue is raised if the search is performed by a male guard on a female prisoner, or a female guard on a male prisoner; or if the search is visual rather than digital (it was both in *Bell v. Wolfish* ); or if what is being watched is the prisoner's genitalia rather than the interior of his rectum. *Jordan v. Gardner*, supra, 986 F.2d at 1522, holds that "a policy that requires male guards to conduct random, non-emergency, suspicionless clothed body searches on female prisoners," violates the Eighth Amendment. What Johnson alleges is worse, albeit with the sexes reversed.

The Eighth Amendment requires in my view that reasonable efforts be made to prevent frequent, deliberate, gratuitous exposure of nude prisoners of one sex to guards of the other sex. I doubt that any more precise statement of the proper constitutional test is feasible. It is precise enough to show that my colleagues indulge in hyperbole when they say that a decision for Johnson would mean that "female guards are shuffled off to back office jobs." They would not be, but that is not the most important point. The most important point is that sexual equality may not be pursued with no regard to competing interests, and with an eye blind to reality. The reality is that crime is gendered, and the gender is male. Stephen J. Schulhofer, *"The Feminist Challenge in Criminal Law*," 143 University of Pennsylvania Law Review 2151 (1995). The vast majority of criminals are male. The vast majority of their victims are male. The vast majority of police and correctional officers are male. These are inescapable realities in the design of penal institutions and the validation of penal practices.

My colleagues toy with the idea that unless the intentions of the prison officials are in some sense punitive, there can be no liability under the cruel and unusual punishments clause, whatever the psychological impact of the prison's actions. There is support for this suggestion in language of some lower-court cases quoted in *Wilson v. Seiter*, supra, 501 U.S. at 300. But I do not think that that language was intended to override the distinction between motive and intent. The cruel and

30

unusual punishments clause is not limited to sadistic inflictions, or, as my colleagues put it, to cases in which "the state has created risk or inflicted pain pointlessly " (my emphasis). The motives of prison officials and guards are in fact irrelevant. The relevant deliberateness is the deliberate adoption of a measure that constitutes cruel and unusual punishment. If prison officials use the thumbscrew and rack to discipline unruly prisoners, it is immaterial that their motive is not to punish but merely to maintain good order in the prison, or to save money. Id. at 301-02. The public beheadings of murderers by Saudi Arabia are, I imagine, motivated not by sadism but rather (to the extent that they have any secular motivation) by a belief that the public infliction of cruel punishments minimizes the crime rate. If prison officials deliberately expose male prisoners to the gaze of female guards, or female prisoners to the gaze of male guards, it should be irrelevant that the motive of the officials may have been merely to avoid sorting custodial tasks by gender.

The distinction between motive and intent runs all through the law. If someone plants a bomb in an airplane, his intent in the eyes of the law is to kill, though his motive might be to intimidate political opponents, obtain publicity, demonstrate skill with explosives, collect life insurance on a passenger, or distract the police from his other criminal activities. More to the point, the distinction that I am emphasizing between motive and intent is implicit in the standard of "deliberate indifference" which the courts use to determine whether the state of mind required by the Eighth Amendment is present. That standard is satisfied by proof of "actual knowledge of impending harm easily preventable," *Duckworth v. Franzen*, supra, 780 F.2d at 653--a formulation that dispenses entirely with any investigation of motive. If prison officials know that they are subjecting male prisoners to gratuitous humiliation, the infliction is deliberate, even if the officials are not actuated by any punitive purpose and are not even certain that humiliation will result. "[A]n eighth amendment complainant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, supra, 511 U.S. at ----, 114 S.Ct. at 1981. The principal application of the standard of deliberate indifference is to cases of medical care. If prison officials, knowing that an inmate is seriously ill, refuse to provide him with any treatment, the fact that their motive is not to punish him but merely to save time and money is not a defense to his Eighth Amendment claim.

I turn now to the question whether the complaint states a claim for the infringement of the right that I have sketched. The defendants appeal to the principle repeated in a number of recent cases that although the Federal Rules of Civil Procedure require only a short and plain statement of the plaintiff's claim, a plaintiff who decides to write a prolix complaint risks pleading himself out of court by alleging facts (which bind him as judicial admissions) that negate an element of his claim. The defendants fasten on the allegation in the complaint that there was a "sheet" between the bathroom (containing both showers and toilets) used by Johnson and other male inmates and the area in which the guards are stationed. In fact what Johnson alleged was that

when a female correctional officer is assigned to work a dorm it is her duty and responsibility to make counts, also to constantly supervise all inmates in the dorms, making periodic, unannounced spot checks of inmates in their living area, and s[u]rveying in the remainder

31

of the area such as the general toilet, and shower facilities, which is in an open unobstructed area, except by a thin sheet that can be seen through.

This can fairly be read to allege that female guards assigned to Johnson's dorm are responsible for maintaining visual surveillance of the bathroom, which they are able to do because it is separated from the part of the dorm in which the guards are stationed by a transparent "sheet," perhaps a kind of shower curtain. So read, the complaint is consistent with a form of cross-sex surveillance sufficiently frequent, gratuitous, and deliberate to withstand dismissal on the pleadings. A further factual inquiry is necessary to determine whether Johnson's constitutional rights have been violated.

My colleagues say that we must respect "the hard choices made by prison administrators." I agree. There is no basis in the record, however, for supposing that such a choice was made here, or for believing that an effort to limit cross-sex surveillance would involve an inefficient use of staff- - "featherbedding," as my colleagues put it. There is no record. The case was dismissed on the complaint. We do not know whether the Cook County Jail cannot afford a thicker sheet or, more to the point, cannot feasibly confine the surveillance of naked male prisoners to male guards and naked female prisoners to female guards. We do not even know what crime Johnson is charged with. My colleagues urge deference to prison administrators, but at the same time speak confidently about the costs of redeploying staff to protect Johnson's rights. It would be nice to know a little more about the facts before making a judgment that condones barbarism.

## NOTES AND COMMENTS

Title VII's insistence on a gender neutral workplace bumps against deeply rooted cultural norms. When those norms rest upon romantic paternalism, they fall before the statutory command of equality. Is this such a case?

It may strike you as odd to read three cases involving prison guards. But it should not; correctional officers represent one of the fastest growing occupations in the United States.

As women have taken their rightful place in the workplace, they have also gained the opportunity to commit crimes once the domain of men. Though men still greatly outnumber women in our prisons, the gap appears to be shrinking. Would Judge Easterbrook have reached the same conclusion if the would be guards were men seeking employment in a women's correctional institution?